1   **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   Aviva USA Corporation, an Iowa )   No. CV 11-0369-PHX-JAT
    corporation; and Aviva Brands Limited, a)
10  United Kingdom limited company,     )   **ORDER**
                                        )
11          Plaintiffs,                 )
                                        )
12  vs.                                 )
                                        )
13                                      )
    Anil Vazirani, an individual; Vazirani &)
14  Associates Financial, LLC, an Arizona)
    limited liability company; Secured)
15  Financial Solutions, LLC, an Arizona)
    limited liability company; James Regan, an)
16  individual; and Regan & Associates, LLC,)
    an Arizona Limited liability Company    )
17                                      )
            Defendants.                 )
18  _____)
                                        )
19  Anil Vazirani, an individual; Vazirani &)
    Associates Financial, LLC, an Arizona)
20  limited liability company; and Secured)
    Financial Solutions, LLC, an Arizona)
21  limited liability company,          )
                                        )
22          Counterclaimants,           )
                                        )
23  Aviva USA Corporation, an Iowa)
    corporation; and Aviva Brands Limited, a)
24  United Kingdom limited company,     )
                                        )
25          Counterdefendants.          )
    _____)
26

27          Pending before the Court are the parties' cross-motions for summary judgment.

28  Plaintiffs and counterdefendants Aviva USA Corporation ("AUSA") and Aviva Brands

Limited ("ABL", and together with AUSA, "Aviva") have moved for summary judgment on their federal and state trademark infringement and unfair competition claims and on their cybersquatting claim.  Defendants Anil Vazirani, Vazirani & Associates Financial, LLC ("VAF"), Secured Financial Solutions, LLC ("SFS," and together with Mr. Vazirani and VAF, the "Vazirani Defendants" or "Counterclaimants"), James Regan, and Regan & Associates, LLC (collectively, the "Regan Defendants," and together with the Vazirani Defendants, the "Defendants") have also moved for summary judgment on those claims, in addition to Aviva's state law racketeering claim.  Aviva also filed a motion to seal certain evidence submitted with its motion for summary judgment.  The Court now rules on the motions.

## I.    BACKGROUND

Aviva is one of the largest insurance companies in the world and serves customers in the life insurance and annuity sector.  Though the Vazirani Defendants once sold Aviva's life insurance and annuity products, and related services, under an agreement with certain affiliates of Aviva, that relationship has been terminated.  Defendants now offer those services in competition with Aviva.  Defendant Anil Vazirani, Aviva, and other related parties are presently engaged in a series of legal disputes arising out of the termination of the contractual relationship between Mr. Vazirani and Aviva.  In the present lawsuit, Aviva alleges that Defendants have infringed Aviva's trademarks and committed acts of racketeering against Aviva.

### A.    Aviva's Marks

ABL owns U.S. Trademark Registration No. 2,773,101 for the mark AVIVA as used in connection with life insurance underwriting and related services.  According to Aviva, AUSA and its affiliates have, with ABL's authorization, used the AVIVA mark in interstate commerce since at least 2006 to identify AUSA and its affiliates as the source of a variety of life insurance and annuity products, and related services, sold by AUSA's affiliates, and to distinguish those products and services from those sold by others.  Aviva also asserts that, since at least November 2006, AUSA and its affiliates have used in commerce a trade dress

consisting of (1) a yellow, blue, and green color scheme; (2) the appearance of a ray of light emanating from the yellow background; and (3) the use of a serif, all-capitals font for the AVIVA mark (the "Trade Dress"), to identify AUSA and its affiliates as the source of their life insurance and annuity products and related services, and to distinguish those products and services from those sold by others.  Aviva also displays a graphic to the left of the AVIVA mark consisting of a blue, almost-square shaped object, joined at the top with, and separated at the bottom from, a green, almost-rectangular shaped object.  Aviva alleges that AUSA has expended great effort and expense to develop and maintain the goodwill associated with the AVIVA mark and the Trade Dress (collectively, "Aviva's Marks").  As they appear on AUSA's website, Aviva's Marks look like this:



### B.     Mr. Vazirani's Relationship with Aviva

Anil Vazirani is an independent life insurance and annuity sales agent.  As an independent agent, Vazirani requires the authorization of any carrier whose life insurance or annuity products he wishes to sell.  Vazirani's company, Defendant VAF, operates as an independent marketing organization, or "IMO."  Defendant SFS conducts marketing and other activities for VAF.  In early 2009, AUSA terminated Vazirani's authorization to sell the life insurance and annuity products of Aviva's issuing affiliates.  The termination had the effect not only of barring Vazirani from selling products issued by AUSA's issuing subsidiaries, and thus from earning commissions on the sale of those products, but also of barring Vazirani's IMO, VAF, from earning any income on the sale of such products by an agent.  As stated by the Vazirani Defendants, now that they are no longer associated with Aviva, they offer similar services in competition with Aviva.  Doc. 174 at 3.

In the time since his contract with Aviva was terminated, Mr. Vazirani initiated four lawsuits.  The first, filed in Maricopa County Superior Court on April 13, 2009, asserted

1  claims by Mr. Vazirani and SFS against certain IMO's and others, whom Mr. Vazirani

2  alleged were involved in his termination.  One of the IMO's sued in that action was Creative

3  Marketing, an AUSA subsidiary.  The second, filed in the U.S. District Court for the District

4  of Kansas on October 9, 2009, asserted claims by Vazirani and SFS against Mark Heitz, a

5  former employee of AUSA, whom Mr. Vazirani alleged was involved in his termination.

6  The third and fourth lawsuits, in which Mr. Vazirani again alleged wrongful conduct in

7  connection with his termination, were filed on January 27, 2011 in Maricopa County

8  Superior Court and on January 28, 2011 in the District of Kansas, respectively.  Mr. Vazirani

9  did not name AUSA or ABL as a defendants in any of the suits.

10       On July 28, 2010, when only the first two suits were being litigated, Mr. Vazirani's

11  counsel sent an email to counsel for Defendants in those suits.  At least one of the attorneys

12  who received the letter apparently also represented AUSA at the time.  Doc. 182.  The email,

13  in its entirety, stated the following:

14       Counsel,

15       As you know, we have received disclosure documents from all the defendants
       as well as from Aviva in the related Heitz litigation pending in Wichita,
16       Kansas[.]

17       The e-mails totally belie Aviva's claim that Mr. Vazirani was terminated as
       part of its decision to focus on key core groups.  Rather, it is clear that the
18       named defendants' wrongful actions caused Aviva to terminate Mr. Vazirani's
       contract and the contracts of his downline producers.

19
       Among other evidence, there is an e-mail from Mike Tripses of CMIC
20       expressing his intent to cause Mr. Vazirani's contracts to be terminated not just
       with Aviva, *but with all insurance carriers that Mr. Vazirani does business*
21       *with*.  Unlike most agents, Mr. Vazirani holds a Series 65 Securities License
       and carries the LUTCF designation and is a Qualified Financial Advisor
22       through Kaplan Financial.  According to Mr. Tripses, Mr. Vazirani's offense
       was that he had reported to Aviva instances where competing insurance agents
23       had provided securities and investment advice that they were not licensed to
       provide.  Mr. Tripses is currently the Chairman of the Board of Directors of
24       the National Association for Fixed Annuities ("NAFA").  In that high profile
       position, one would hope that Mr. Tripses would not be advocating the mass
25       termination of an industry leading, "half [sic] of fame" minority agent and
       business owner for asking that Aviva hold all agents to the rule that they not
26       provide securities advice without proper licensure.  It is particular unseemly
       given NAFA's ongoing fight against Rule 151A.

27       There are several e-mails from Advisors Excel talking about "setting up" Anil
28       for termination and expressing satisfaction in their successful efforts to

- 4 -

convince Aviva to terminate Mr. Vazirani and Phil Wasserman, both of whose downline agent Advisors Excel subsequently targeted for recruitment.

As for Ronald Shurts, there is an e-mail from Mr. Shurts telling Aviva to "TERMINATE THAT . . . IDIOT."

There are numerous e-mails from Aviva' [sic] representatives that Aviva terminated Mr. Vazirani at the behest of the named Defendants and without any legitimate business justification for doing so.

In light of Mr. Tripses' threat, we plan to send a letter to all of the insurance carriers that Mr. Vazirani does business with that includes various non-confidential disclosure documents that demonstrate that it is not Mr. Vazirani who has engaged in misconduct, but these defendants. We have also retained a PR firm to publicize the injustices suffered by Mr. Vazirani at the hand of your clients and Aviva.

Prior to taking these actions, we wanted to give your clients the opportunity to discuss a fair and equitable settlement with Mr. Vazirani and/or to participate in an early mediation. If we don't hear from you by close of business Monday, August 3, 2010, we will be left with no choice but to take the actions outlined above.

Regards,

David G. Bray . . .

Doc. 182 at 76 (emphases in original). The is no evidence that any of the invited discussions of settlement or mediation ever took place.

## C.    The Defendants' Website and "Blast Emails"

Instead, Mr. Vazirani, along with Mr. Regan and others, implemented a plan to apparently make good on Mr. Vazirani's intention to  "publicize the injustices suffered by Mr. Vazirani." *Id.* This plan primarily involved developing a website that Mr. Vazirani used to criticize Aviva and its business practices ("the Website"). A heading was included on the Website that appeared on each page and read: "AVIVA Uncovered The Sad Truth About Aviva's Business Practices." Doc. 188-1 at 142-52. The heading also incorporates some elements of Aviva's Trade Dress:



The Website includes several different sections, including "Anil's Background,"

which introduces Mr. Vazirani, his history with Aviva, and his concerns about Aviva, and also includes a photograph of Mr. Vazirani; "Anil's Case Against Aviva," which details the lawsuits initiated by Mr. Vazirani in connection with the termination of his agreement with Aviva; "The Illinois Complaint Against Mark Heitz," which links to a news release about a case alleging deceptive marketing practices against Mr. Heitz and also links to a related complaint filed in that case; "Aviva's Class Action Settlement," which links to a complaint in a case filed against Aviva alleging that Aviva deceptively marketed to elderly people; "Newsroom," which contains no content, but is reserved for "[n]ews releases and related stories" that might appear in that section in the future; and "Tell us your story about Aviva," which allows visitors to the site to send a message to the operators of the Website, presumably to share their own experiences dealing with Aviva. Doc. 188-1 at 142-52. An alternate version of the Website also includes sections entitled "Anil's Legal Filings & Supporting Emails," which links to the complaints filed in his lawsuits and various emails at issue in those lawsuits; "The Washburn University/Sigma Pi Epsilon Connection," wherein Mr. Vazirani alleges a connection between some of the people involved in his lawsuits and a fraternity to which they apparently all belonged; and "Complaint Implicating Aviva in a Ponzi Scheme," which links to a complaint  in the case alleging deceptive marketing practices to elderly people and also to an "FBI report that also connects Aviva to the Ponzi scheme." *Id.*

Defendants also registered fourteen domain names in connection with the Website, each of which referenced Aviva. Those domain names are *insideaviva.com*, *aviva-exposed.com*, *avivauncovered.com*, *aviva-uncovered.com*, *aviva-lawsuit.com*, *avivacomplaints.com*, *avivaplcsucks.com*, *avivasucksusa.com*, *anilvaziranivsaviva.com*, *anilvsaviva.com*, *avivavsanilvazirani.com*, *avivavsanil.com*, *aviva-problems.com*, and *aviva-litigation.com*. Doc. 42 at ¶¶ 31-61. Some of these domain names were registered with false names and contact information. Furthermore, Defendants also sent out a series of "blast emails" to hundreds of thousands of life insurance and annuity sales agents and stockbrokers, providing a link to the Website. Doc. 178 at ¶ 3.13. Those emails appear to have all stated,

in their entirety, the following: "A detailed summary making a case against Aviva . . . http://www.aviva-uncovered.com." *E.g.*, Doc. 179 at 13.

### D.    Aviva's Racketeering Allegations

In addition to the claims based on trademark infringement, Aviva also alleges that Defendants' conduct constitutes racketeering. Specifically, Aviva contends that Defendants are "participating in, operating and/or controlling a criminal enterprise . . . targeting Aviva with a campaign of cyber-terrorism in an effort to extort money from Aviva, unfairly compete with Aviva, and otherwise commercially harm Aviva." Doc. 42 at ¶ 1. That alleged "smear campaign" allegedly consists of the Website, "[t]he ostensible purpose [of which] has been to air the Vazirani Defendants' grievances towards Aviva and its associates over the termination of their commercial relationship with the Vazirani Defendants," *id.* at ¶¶ 1, 4, and the blast e-mails "directed at Aviva's agents, potential agents, and consumers, which disparaged Aviva . . . [and] asserted that Aviva had been implicated in a Ponzi scheme. . . ." *Id.* at ¶ 56. In the amended complaint, Aviva also alleges that the publication of the Website and blast e-mails "have damaged Aviva and will continue to damage Aviva, causing injury to Aviva's reputation and goodwill." *Id.* at ¶¶ 98, 108, 124. Aviva further contends that the Website and blast e-mails are the fruits of a criminal enterprise directed by Defendants and that, by publishing the Website and e-mails, Defendants have engaged in a "pattern of racketeering activity" that consists of three predicate acts—"[e]xtortion, forgery, and wire fraud." *Id.* at ¶¶ 5, 20-63. The extortion allegation arises from the email sent by Mr. Vazirani's attorney, in which he describes Mr. Vazirani's intention, in the absence of an equitable settlement or mediation, to publicize negative information about Aviva. The forgery and wire fraud allegations arise from the use of false contact information to register some of the domain names.

### E.    Aviva's Claims

Aviva subsequently brought suit in this Court, claiming trademark infringement, cybersquatting, common law unfair competition, and racketeering under both federal and state law. This Court granted Defendants' motion for judgment on the pleadings on Aviva's

1   federal racketeering claim (Doc. 169).  Currently pending before the Court are the parties'

2   motions for summary judgment.  Aviva moved for summary judgment on its trademark

3   infringement, cybersquatting, and unfair competition claims (Doc. 177).  The Vazirani

4   Defendants also moved for summary judgment on those claims, in addition to Aviva's state

5   law racketeering claim (Docs. 174 & 175).  The Regan Defendants moved for summary

6   judgment on all claims, arguing that Aviva has failed to meet its burden on damages (Doc.

7   172).  The Court now rules on the motions.

8   **II.     LEGAL STANDARD FOR SUMMARY JUDGMENT**

9          Summary judgment is appropriate when "the movant shows that there is no genuine

10  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

11  FED. R. CIV. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must

12  support that assertion by . . . citing to particular parts of materials in the record, including

13  depositions, documents, electronically stored information, affidavits, or declarations,

14  stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that

15  materials cited do not establish the absence or presence of a genuine dispute, or that an

16  adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A)&(B).

17  Thus, summary judgment is mandated "against a party who fails to make a showing

18  sufficient to establish the existence of an element essential to that party's case, and on which

19  that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

20  (1986).

21         Initially, the movant bears the burden of pointing out to the Court the basis for the

22  motion and the elements of the causes of action upon which the non-movant will be unable

23  to establish a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the non-

24  movant to establish the existence of material fact.  *Id.*  The non-movant "must do more than

25  simply show that there is some metaphysical doubt as to the material facts" by "com[ing]

26  forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec.*

27  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting FED.R.CIV.P. 56(e)

28  (1963) (amended 2010)).  A dispute about a fact is "genuine" if the evidence is such that a

1    reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,*

2    *Inc.*, 477 U.S. 242, 248 (1986).   The non-movant's bare assertions, standing alone, are

3    insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.*

4    at 247–48.   However, in the summary judgment context, the Court construes all disputed

5    facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d

6    1072, 1075 (9th Cir. 2004).[1]

7

8

9

10       [1] In the Order dated January 10, 2012 (Doc. 101), this Court granted in part and denied

11   in part Aviva's motion for spoliation sanctions.   Specifically, the Court granted Aviva's
     request for adverse inference instructions as follows: "If Plaintiffs believe that Defendants'

12   spoliation affects their ability to dispute summary judgment, Plaintiffs may propose an
     appropriate adverse inference in response to any motion for summary judgment. If Plaintiffs

13   propose inferences in response to a summary judgment motion, they must specify how
     Defendants' spoliation has prevented them from disputing specific facts, the discovery they

14   have undertaken to obtain those facts, and how an inference in their favor would prevent
     summary judgment as a matter of law." Doc. 101 at 13.

15

16

17       Aviva has only raised the possibility of applying an adverse inference in its Reply to
     its own motion for summary judgment (Doc. 224), which improperly deprived Defendants

18   of any opportunity to respond. *See Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 682 (S.D.
     Cal. 1999) ("It is well accepted that raising of new issues and submission of new facts in [a]

19   reply brief is improper").   Furthermore, Aviva does not propose an adverse inference that
     would prevent the Court from granting summary judgment against Aviva, but rather only

20   asks for an inference that would "fill[] any gaps the Court otherwise might be inclined to
     find" in considering and granting summary judgment in favor of Aviva.   Plaintiffs therefore

21   have not proposed any adverse inferences in accordance with the Court's instructions.

22

23       Moreover, the only evidence to which Aviva suggests that the Court should apply an
     adverse inference relates to Aviva's request for Defendants to produce text messages and

24   emails regarding their "anti-Aviva campaign." Doc. 224 at 21.   The Court, however, finds
     that such evidence, even if it were available, could not change the outcome of the Court's

25   analysis with respect to Aviva's motion for summary judgment.   Accordingly, the Court will
     not apply any adverse inferences in deciding the pending motions for summary judgment.

26   Further, Defendants' motion to strike Aviva's arguments regarding an adverse inference
     (Doc. 228) is denied as moot.   Oral argument on this issue would not have aided the Court's

27   decisional process. *See* LRCiv 7.2(f).

28

### III.   AVIVA'S LANHAM ACT INFRINGEMENT CLAIMS

#### A.   Trademark Validity

"Before [trademark] infringement can be shown, the trademark holder must demonstrate that it owns a valid mark, and thus a protectable interest." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005). Here, Aviva claims to have a protectable interest in its AVIVA mark, which its predecessor, Grey Panthers Limited, registered with the U.S. Patent and Trademark Office on Oct. 14, 2003. Doc. 180 at 10. Aviva also claims to have a protectable interest in its Trade Dress, "which [Aviva USA] and its affiliates have used continuously and substantially exclusively since at least November 2006 to identify and distinguish their products and services." Doc. 177 at 12.

Though in their Counterclaims, Counterclaimants alleged that Aviva's Trade Dress "is not inherently distinctive and has not acquired secondary meaning," Doc. 50 at ¶ 14, the Counterclaimants have not offered any arguments in their summary judgment briefing contesting the protectability of Aviva's Trade Dress. Nor have Counterclaimants contested the protectability of the AVIVA mark. Aviva moved for summary judgment in its favor on this part of Counterclaim No. 2. Therefore, summary judgment is granted in favor of Aviva on the part of Counterclaim No. 2 that alleges that Aviva's Trade Dress "is not inherently distinctive and has not acquired secondary meaning." The Court will discuss the remainder of the Counterclaims in greater detail below.

#### B.   Commercial Use

Aviva has alleged that Defendants have violated sections 32 and 43(a) of the federal Lanham Act by unlawfully using Aviva's Marks. Section 32 creates liability for any person's use of a registered mark, without the consent of the registrant, "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114. Similarly, section 43(a) prohibits any person from using "in connection with any goods or services . . . any word, term, name, symbol, or device, or any combination thereof" that is likely to cause confusion or mistake as to the origin of the goods

or services. *Id.* § 1125(a). By requiring that infringement occur in connection with (the sale of) any goods or services, infringement claims brought under either of these sections are subject to a commercial use requirement. *See Bosley Med. Inst. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) (commercial use requirement applies to § 32 claims); *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1051-53 (10th Cir. 2008) (commercial use requirement also applies to § 43(a) claims). Thus, a use that does not meet this requirement, i.e., a noncommercial use, cannot create liability under sections 32 and 43(a) of the Lanham Act. *See Bosley*, 403 F.3d at 676; *see also Utah Lighthouse Ministry*, 527 F.3d at 1054 ("Unless there is a competing good or service labeled or associated with the plaintiff's trademark, the concerns of the Lanham Act are not invoked.").

This commercial use requirement comports with the primary purpose of the Lanham Act, which is to "protect consumers who have formed particular associations with a mark from buying a competing product using the same or substantially similar mark and to allow the mark holder to distinguish his product from that of his rivals." *Bosley*, 403 F.3d at 676. The commercial use requirement also ensures that the Lanham Act's prohibitions on speech are consistent with the First Amendment: "As a matter of First Amendment law, commercial speech may be regulated in ways that would be impermissible if the same regulation were applied to noncommercial expressions." *Id.* at 677 (citing *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995)). Further, the Ninth Circuit has stated that "[t]he First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *Id.* (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002)).

The distinction between commercial and noncommercial use is particularly important in the context of consumer or editorial criticism and commentary. *See* 135 Cong. Rec. H1207, H1217 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) ("[T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material. . . . The

section is narrowly drafted to encompass only clearly false and misleading commercial speech."). Even though a trademark holder will almost never consent to the use of its mark in conjunction with commentary that is critical of the trademark holder or its products and services, the trademark holder also cannot seek the protections of the Lanham Act to stop such critical use when it does not occur in connection with the sale of goods or services. *See Bosley*, 403 F.3d at 679 ("The Lanham Act, expressly enacted to be applied in commercial contexts, does not prohibit all unauthorized uses of a trademark."). As the Ninth Circuit stated, a plaintiff in such instances "cannot use the Lanham Act either as a shield from [a defendant's] criticism, or as a sword to shut [a defendant] up." *Id.* at 680. On the other hand, when the criticism and unauthorized use of the mark *do* occur in connection with the sale of goods or services, the mark holder may pursue and potentially succeed on a Lanham Act infringement claim. *See Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1032, 1056-58 (D. Kan. 2007) ("[T]he Court cannot find as a matter of law that defendants' website speech, including the chosen domain name, is 'noncommercial' speech. Although the speakers on the website were anonymous or disguised, they were direct competitors of Sunlight and defendants had no apparent reason to disparage Sunlight products except to promote their own."); *cf. HER, Inc. v. RE/MAX First Choice, LLC*, 468 F. Supp. 2d 964, 975, 978-79 (S.D. Ohio 2007) (finding that the plaintiffs were likely to succeed on their § 32 claim where the defendants had "criticized the [p]laintiffs, but only in conjunction with commercially related speech" because the defendants were "in direct business competition with the [p]laintiffs" and their "use of the trademarks and tradenames [was] directly related to [the defendants'] business").

In *Bosley*, the Ninth Circuit addressed this distinction between commercial and noncommercial use in the context of a "cybergripe" website. The plaintiff, Bosley Medical Institute ("Bosley Medical"), was a provider of various surgical hair transplantation, restoration, and replacement services. *Bosley*, 403 F.3d at 674. Bosley Medical also owned the registered mark "Bosley Medical." *Id.* The defendant, Kremer, was a "dissatisfied former patient" of Bosley Medical who had attempted to sue Bosley Medical for medical

malpractice. *Id.* at 675.   After that suit was dismissed, Kremer purchased the domain name www.BosleyMedical.com. *Id.*   Kremer posted on the website associated with that domain name content that was critical of Bosley Medical, which the court summarized as follows:

> Kremer began to use www.BosleyMedical.com in 2001. His site summarizes the Los Angeles County District Attorney's 1996 investigative findings about Bosley, and allows visitors to view the entire document. It also contains other information that is highly critical of Bosley. Kremer earns no revenue from the website and no goods or services are sold on the website. There are no links to any of Bosley's competitors' websites. BosleyMedical.com does link to Kremer's sister site, BosleyMedicalViolations.com, which links to a newsgroup entitled alt.baldspot, which in turn contains advertisements for companies that compete with Bosley. BosleyMedical.com also contained a link to the Public Citizen website. Public Citizen is the organization that represents Kremer in this case.

*Id.* In addition, prior to creating the website, Kremer delivered to Bosley Medical a letter warning Bosley Medical of Kremer's intention to spread critical information about the company over the internet and also offering the company's president the opportunity to "discuss this" with Kremer.[2] *Id.*

In finding that Kremer's site was not commercial, the Ninth Circuit rejected three of Bosley Medical's arguments that the site satisfied the "in connection with the sale of goods or services" requirement.   First, the court rejected Bosley Medical's contention that "a mark used in an otherwise noncommercial website or as a domain name for an otherwise noncommercial website is nonetheless used in connection with goods and services where a user can click on a link available on that website to reach a commercial site." *Bosley*, 403 F.3d at 677.   Finding that Bosley Medical's assertion was "unfounded," the court stated:

> Kremer's website contains no commercial links, but rather contains links to a discussion group, which in turn contains advertising.  This roundabout path to the advertising of others is too attenuated to render Kremer's site commercial.

---

[2] The first page of Kremer's letter stated the following: "Let me know if you want to discuss this.  Once it is spread over the internet it will have a snowball effect and be too late to stop.  M. Kremer [phone number].  P.S.  I always follow through on my promises." *Bosley*, 403 F.3d at 675.  The second page, which was entitled "Courses of action against BMG," included the following enumerated item: "1. Net web sites disclosing true operating nature of BMG.  Letter 3/14/96 from LAC D.A.  Negative testimonials from former clients.  Links.  Provide BMG competitors with this information." *Id.*  The letter did not mention any domain names or other references to the Internet. *Id.*

> At no time did Kremer's BosleyMedical.com site offer for sale any product or service or contain paid advertisements from any other commercial entity.

*Id.* at 678 (citing *TMI, Inc. v. Maxwell*, 368 F.3d 433, 435, 438 (5th Cir. 2004) (holding that the commercial use requirement is not satisfied where defendant's site had no outside links)). The court also rejected the possibility that the link to Kremer's lawyers included on the site could transform the site from noncommercial to commercial. *Id.*

Second, the court found that there was no evidence that "Kremer created his website to enable an extortion scheme in an attempt to profit from registering BosleyMedical.com." *Id.* Distinguishing the case from others in which a party had attempted to sell the domain name to the party owning the trademark, *see, e.g.*, *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1325 (9th Cir. 1998), the court stated that "[t]he letter delivered by Kremer to [Bosley Medical's] headquarters is a threat to expose negative information about [Bosley Medical] on the Internet, but it makes no reference whatsoever to ransoming [Bosley Medical's] trademark or to Kremer's use of the mark as a domain name." *Id.* Thus, the court found that Kremer's mere threat to publicly criticize Bosley Medical on his website, in the absence of an offer to sell the domain name to Bosley Medical, did not constitute a commercial use of Bosley Medical's trademark.

Finally, Bosley Medical's third argument that the commercial use requirement was satisfied was that Kremer used the mark in connection with, and prevented users from obtaining, *Bosley Medical's* goods and services. As noted by the *Bosley* court, the Fourth Circuit has endorsed the view that a parody website, though it has no commercial purpose and does not sell any goods or services, may nonetheless meet the Lanham Act's commercial use requirement if it prevents users from obtaining the goods or services of the entity targeted by the parody. *Bosley*, 403 F.3d at 678-79 (citing *People for the Ethical Treatment of Animals v. Doughney* ("*PETA*"), 263 F.3d 359 (4th Cir. 2001)). Specifically, the *PETA* court stated that the defendant in that case "need not have actually sold goods or services," but rather "need only have prevented users from obtaining or using PETA's goods or services." *PETA*, 263 F.3d at 365. The Ninth Circuit, however, disagreed with *PETA*'s "over-

expansive" approach: "The *PETA* approach would place most critical, otherwise protected consumer commentary under the restrictions of the Lanham Act. . . . The *PETA* court's reading of the Lanham Act would encompass almost all uses of a registered trademark, even when the mark is merely being used to identify the object of consumer criticism." *Bosley*, 403 F.3d at 679. Thus, the Ninth Circuit rejected Bosley Medical's third argument and instead adopted a narrower view of the commercial use requirement: "Limiting the Lanham Act to cases where a defendant is trying to profit from a plaintiff's trademark is consistent with the Supreme Court's view that '[a trademark's] function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his.'" *Id.* (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918)). The Court therefore affirmed the district court's grant of summary judgment in favor of Kremer on Bosley Medical's Lanham Act claims. *Id.* at 682.

The undisputed facts of this case require a similar outcome. Much like the website in *Bosley*, there is no evidence here that Defendants offered for sale any goods or services on the Website. Nor did the Website contain any links to other sites that offered goods or services for sale. Additionally, there is no evidence that any of Defendants ever attempted to sell the Website or domain name to Aviva or any other party for profit. Based on the Ninth Circuit's decision in *Bosley*, these facts all strongly urge the conclusion that the Website was noncommercial.

Nevertheless, Aviva argues that Defendants published the Website "in connection with goods or services" because "it seeks to inflict commercial harm on Aviva" and because the intention of the website was "to divert business from Aviva to [Vazirani]." Doc. 206 at 8. However, to the extent that Aviva suggests that the Website is commercial merely because it prevented users from using or obtaining Aviva's goods or services, that argument is unavailing. As previously described, the Ninth Circuit rejected this reasoning in *Bosley*. *See Bosley*, 403 F.3d at 679. Accordingly, this Court will not adopt the broad interpretation of

commercial use endorsed by the Fourth Circuit in *PETA* urged here by Aviva.[3]

Aviva further contends that the Website satisfies the Lanham Act's commercial use requirement because it was designed for "commercial gain." Specifically, Aviva states that

> [the Website] touts Vazirani's financial accomplishments and credentials as a seller of products competing with products available through Aviva's affiliates. It advertises Vazirani's name in connection with those accomplishments. By doing so, it lets consumers know where to procure Vazirani's financial services, because he is doing business under his name at *anilvazirani.com*. Vazirani's purpose with the Website was to drive business to Vazirani and gain a commercial advantage at Aviva's expense. The purpose is clear—to get his contracts with Aviva restored, and to extract payment, settlement, and other benefits from Aviva. This was the purpose behind the July 28, 2010 extortionate demand from Vazirani's counsel. Vazirani admits he wants his contracts back and he want Aviva to pay him.

Doc. 206 at 8 (citations omitted).

First, there is no mention of Mr. Vazirani's *anilvazirani.com* website on the Website. Thus, the Website does not give any indication as to how to find that site, other than perhaps through trial-and-error guessing of the domain name. The Court therefore does not find credible Aviva's claim that Mr. Vazirani intended to "drive business" to his other website.

Also, with regard to the July 28, 2010 "extortionate demand" letter, the Court views this communication from Mr. Vazirani's counsel to Aviva's counsel as analogous to the communications between Kremer and Bosley Medical. The July 28, 2010 letter stated, in pertinent part, the following:

> There are numerous e-mails from Aviva' [sic] representatives that Aviva terminated Mr. Vazirani at the behest of the named Defendants and without any legitimate business justification for doing so.
>
> In light of Mr. Tripses' threat, we plan to send a letter to all of the insurance carriers that Mr. Vazirani does business with that includes various non-confidential disclosure documents that demonstrate that it is not Mr. Vazirani who has engaged in misconduct, but these defendants. We have also retained a PR firm to publicize the injustices suffered by Mr. Vazirani at the hands of your clients and Aviva.
>
> Prior to taking these actions, we wanted to give your clients the opportunity to discuss a fair and equitable settlement with Mr. Vazirani and/or to participate

---

[3] In any event, the facts of this case are easily distinguishable from *PETA* insofar as the website at issue in that case "provide[d] links to more than 30 commercial operations offering goods and services." *PETA*, 263 F.3d at 366.

in an early mediation.  If we don't hear from you by the close of business Monday, August 3, 2010, we will be left with no choice but to take the actions outlined above.

Doc. 182 at 76.  Clearly, the letter indicates no attempt to "ransom" Aviva's trademarks or to otherwise sell any of Aviva's trademarks.  Instead, as was the case in *Bosley*, the letter is merely "a threat to expose negative information about [Aviva] . . ." *Bosley*, 403 F.3d at 678.  Though the letter does mention the possibility of "discuss[ing] a fair and equitable settlement," there is no evidence of any attempt by Mr. Vazirani to profit from any sale of the trademarks.  Rather, in the absence of any additional evidence showing otherwise, the only reasonable interpretation of the letter is that Mr. Vazirani believed he had been injured by Aviva and was seeking some sort of restitution, monetary or otherwise, for those injuries.[4]  In light of the fact that the defendant in *Bosley* had previously brought a medical malpractice lawsuit against Bosley Medical and otherwise believed he had been wronged by the company, it is highly unlikely that his desire to "discuss this" with Bosley Medical was any different.  *See Bosley*, 403 F.3d at 675.  Thus, like *Bosley*, the facts here can be distinguished from those cases where commercial use was found from an "attempt to sell the trademarks themselves." *See Panavision Int'l*, 141 F.3d at 1325; *see also Intermatic v. Toeppen*, 947 F. Supp. 1227 (N.D. Ill. 1996).  There is simply no evidence here that Mr. Vazirani, or any of the Defendants, desired to sell Aviva's trademarks, in any form, for profit.

Aviva also argues that it deems Mr. Vazirani to be a "competitor" and that the Website somehow functions as promotion or advertising for goods or services that compete with those sold by Aviva.[5]  However, having reviewed the entire content of the Website, the

---

[4] Additional evidence in the record supports this conclusion.  When pressed on this issue in his deposition, Mr. Vazirani  stated that he "repeatedly asked for [his] contracts back and the loss of revenue suffered." Doc. 188-1 at 23. Again, this is insufficient to demonstrate any intent by Mr. Vazirani to profit from any sale of the Aviva trademarks.

[5] Though it is not clear that Mr. Vazirani directly competes with Aviva, Defendants state that Mr. Vazirani "now offers [life insurance and annuity products, and related services,] in competition with Aviva." Doc. 174 at 3.  For the purposes of this Order, the Court will therefore assume that Mr. Vazirani offers products and services that compete with

Court concludes that only a small portion could even remotely be considered relevant to this argument. Specifically, the following language was included in the "Anil's Background" section of the Website:

> I'm Anil Vazirani and by any measure I'm one of the most successful financial advisers in America. I'm a "Top of the Table" member in the prestigious Million Dollar Round Table, I was a 2004 Hall of Fame Inductee into the Society of Senior Market Professionals, and I have been featured and interviewed in leading industry publications. I've been a member of the National Association of Insurance and Financial Advisors for nearly two decades.

Doc. 188-1 at Exhibit 4. Also, in the "Anil's Case Against Aviva" section, the Website stated the following:

> For many years Aviva's products were among those I used to build diversified portfolios for my clients. Admittedly, it was a mutually beneficial relationship. I underwrote Aviva's products and was one of the company's biggest producers. But then something inexplicably happened. On November 6, 2008, Aviva executive Jordan Canfield notified me that the company would cease doing business with me. Canfield first said it was due to concern about my "business practices" but in subsequence [sic] correspondence Aviva said they weren't required to give me an explanation. Disparaging me for my business practices is a very slippery slope – there has never been a regulatory fine or judgment leveled against me.

*Id.* To interpret these statements as advertising goods or services that compete with Aviva is not reasonable. The Website does not even identify any such goods or services. Rather, at most there is only an implication that, as an apparently successful financial adviser who formerly sold Aviva products, Mr. Vazirani *might* currently sell products that compete with Aviva's products. The Website provides no contact information or any other information that would allow a visitor to the Website to determine whether Mr. Vazirani sells competing products and how the visitor might go about purchasing those products from him.

Hence, in order to connect the Website to an offer from Mr. Vazirani to sell goods or services, a visitor to the Website must first interpret these statements to imply that Mr. Vazirani sells competing products, then leave the Website to research whether that is indeed true and how to actually contact Mr. Vazirani. Only after the visitor subsequently determines

---

Aviva's, though the Court notes that there is no reference to any of those competing products or services on the Website.

that Mr. Vazirani indeed sells products the visitor might want to purchase and reaches out to Mr. Vazirani, assuming correct contact information could be found and doing so feasible, could Mr. Vazirani offer any competing products to the visitor. To describe as attenuated this path from the Website to any potential offers by Mr. Vazirani to sell competing products is an understatement.[6]  And it is far more "roundabout" than the series of links from Kremer's site to commercial advertising in *Bosley*.  *See Bosley*, 403 F.3d at 678.

In addition to Aviva's argument that the Website promotes products that compete with Aviva's products, Aviva also argues that "gripe sites," when operated by competitors, satisfy the commercial use requirement.  Aviva cites two cases to support this proposition: *HER, Inc. v. Re/Max First Choice, LLC*, 468 F. Supp. 2d 964 (S.D. Ohio 2007) and *Sunlight Saunas v. Sundance Saunas*, 427 F. Supp. 2d 1032 (D. Kan. 2006).  These cases, however, can be distinguished from the facts of this case.  In *HER, Inc.*, the defendants specifically directed consumers to the defendants' own website in emails that allegedly infringed the plaintiff's marks, and the allegedly infringing domain names routed visitors to the defendants' website, which provided real estate searching services that directly competed with similar services provided on the plaintiff's website.  *HER, Inc.*, 468 F. Supp. 2d at 968-71.  Thus, that court concluded that "the marks were used by the Defendants in connection with the sale of goods and services."  *Id.* at 978 n.6.

---

[6] There is also evidence that, because links to the Website were included in "blast emails" that were sent out to "an audience of hundreds of thousands of life insurance and annuity agents in the United States," some visitors to the Website may already be familiar with Mr. Vazirani and the products and services that he sells.  Doc. 178 at ¶ 3.13.  However, Aviva also asserts that the emails were materially misleading in that they did not reveal that they were sent by Defendants.  *Id.* at ¶ 3.13-3.14.  Further, it is not clear whether these recipients would likely have any interest in purchasing products and services from Mr. Vazirani, or whether they themselves sell similar products and services in competition with Mr. Vazirani.  Nevertheless, because the emails also did not contain any reference to any goods or services sold by Defendants, or any statements that could be considered to promote such goods or services, any connection between the emails, the Website, and any goods or services offered for sale by Defendants is at least as "roundabout" as the series of links described in *Bosley*.  *See Bosley*, 403 F.3d at 678.

Similarly, in *Sunlight Saunas*, the court found that the defendants "had no apparent reason to disparage [the plaintiff's] products except to promote their own." *Sunlight Saunas*, 427 F. Supp. 2d at 1057. In support of that conclusion, the court cited to evidence that the defendants' website temporarily "included direct links to competitors [and] also stated that 'other companies offer the same products without the fraudulent claims.'" *Id.* Thus, the court could not "find as a matter of law that [the] defendants' website speech, including the chosen domain name, [was] 'noncommercial' speech." *Id.*

Here, in contrast, Defendants' Website did not contain any direct links to sites offering competing goods or services and did not promote any competing companies' goods or services. Nor did any of the domain names registered to Defendants route visitors to any commercial websites or other sites that competed with Aviva. Rather, all of the domain names routed visitors to Defendants' Website, which had a noncommercial purpose—that is, criticizing Aviva's business practices.

In sum, Aviva's attempts to argue that the Ninth Circuit's reasoning in *Bosley* does not apply to the facts of this case are unavailing. The Defendants' use of Aviva's trademarks on the Website and in the domain names "is not in connection with a sale of goods or services—it is in connection with the expression of [Defendants'] opinion *about* [Aviva's] goods and services." *Bosley*, 403 at 679. Hence, to paraphrase the Ninth Circuit,

> [t]he dangers that the Lanham Act was designed to address are simply not at issue in this case. The Lanham Act, expressly enacted to be applied in commercial contexts, does not prohibit all unauthorized uses of a trademark. . . . Any harm to [Aviva] arises not from a competitor's sale of a similar product under [Aviva's] mark, but from [Defendants'] criticism of [Aviva].

*Id.* at 679-80. Accordingly, the Vazirani Defendants' motion for summary judgment on Aviva's Lanham Act infringement claims is granted, and Aviva's motion for summary judgment on those claims is denied.

## C.    Likelihood of Confusion and Nominative Fair Use

Though the Court has found that Defendants' uses of Aviva's Marks do not satisfy the Lanham Act's commercial use requirement, the Court will nevertheless briefly address the issue of likelihood of confusion because Aviva focused almost exclusively on this issue in

its motion for summary judgment on its Lanham Act claims.  Both sections 32 and 43(a) of the Lanham Act require a showing that a defendant's use of a trademark is "likely to cause confusion" as to the origin of goods or services.  The Ninth Circuit typically uses an eight-factor test, known as the "*Sleekcraft* factors," to assess whether a use of a mark is likely to cause confusion.[7]  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  Much of Aviva's motion for summary judgment on its sections 32 and 43(a) claims focuses on the eight *Sleekcraft* factors.

The Ninth Circuit, however, has articulated a different test for cases involving nominative use of a trademark, which occurs when a defendant uses a plaintiff's mark to refer to the *plaintiff's* products, rather than to the defendant's *own* products.  *See New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  That test addresses the following three factors:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Id.*  The Ninth Circuit has further stated the following with regard to nominative use of a trademark:

> In cases in which the defendant raises a nominative use defense, the . . . three-factor [nominative use] test should be applied instead of the test for likelihood of confusion set forth in *Sleekcraft*.  The three-factor test better evaluates the likelihood of confusion in nominative use cases.  When a defendant uses a trademark nominally, the trademark will be identical to plaintiff's mark, at least in terms of the words in question.  Thus, application of the *Sleekcraft* test, which focuses on the similarity of the mark used by the plaintiff and the defendant, would lead to the incorrect conclusion that virtually all nominative uses are confusing.  The three-factor test—with its requirement that the defendant use marks only when no descriptive substitute exists, use no more of the mark than necessary, and do nothing to suggest sponsorship or endorsement by the mark holder—better addresses concerns regarding the likelihood of confusion in nominative use cases.

---

[7] The eight factors include: 1) strength of the mark; 2) proximity of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) type of goods and the degree of care likely to be exercised by the purchaser; 7) defendant's intent in selecting the mark; and 8) likelihood of expansion of the product lines.  *Sleekcraft*, 599 F.2d at 348-49.

*Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002); *see also Mattel v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003) ("The nominative fair use test replaces the traditional [*Sleekcraft*] analysis.").

Here, Defendants have raised a nominative fair use defense.  Indeed, Defendant's use of Aviva's trademark and trade dress was undoubtedly a nominative use—that is, the mark was used to refer to Aviva and its products and services rather than Defendants and their products and services.  As described above, the Website offers no goods or services for sale and references no goods or services other than those of Aviva.  Thus, there is no evidence that Aviva's marks were used in conjunction with any of Defendants' goods or services.  Moreover, the Website's entire purpose is to criticize Aviva and its products, which typically necessitates the nominal use of the criticized party's mark.  *See New Kids on the Block*, 971 F.2d at 306 ("Indeed, it is often virtually impossible to refer to a particular product for purposes of comparison, criticism, point of reference or any other such purpose without using the mark.").  The *Sleekcraft* factors therefore are not applicable here.  *See Welles*, 279 F.3d at 801.

Furthermore, the Court finds that Defendants' use of the mark and trade dress satisfy the three-factor nominative fair use test from *New Kids on the Block*.  The first factor is easily met, for there is no clear way for Defendants to convey their criticism for a specific entity, Aviva, without naming that specific entity.  There is simply no proper descriptive substitute.  *Cf. New Kids on the Block*, 971 F.2d at 308 ("[O]ne might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls.").

The third factor is also satisfied.  With regard to potential infringement by both the domain names and the Website itself, the content of the Website must be considered under a likelihood of confusion analysis.  *See Lamparello v. Falwell*, 420 F.3d 309, 316 (4th Cir. 2005) ("[A] court must evaluate an allegedly infringing domain name in conjunction with the content of the website identified by the domain name.").  As described above, the entire

website is concerned with criticizing Aviva and its business practices.  Therefore, it is not reasonable to conclude that Defendants have taken any actions that would suggest that Aviva supports or endorses the Website or the associated domain names in any way.

The second factor provides a closer question, but is nonetheless also satisfied.  On one hand, Defendants did not merely refer to the name "Aviva" using plain text.  Rather, Defendants used a stylized blue font on a yellow background with rays of light in the background to refer to Aviva.  These additional stylizations are part of Aviva's protected Trade Dress.  In certain cases, such distinctive stylizations might be considered more than is permitted under the Ninth Circuit's nominative fair use test.  *See New Kids on the Block*, 971 F.2d at 308 n.7 ("Thus, a soft drink competitor would be entitled to compare its product to Coca-Cola or Coke, but would not be entitled to use Coca-Cola's distinctive lettering.").

Here, however, the stylized logo and distinctive coloring were not used in a commercial or competitive manner, but rather were used solely to identify Aviva as the object of the Website's criticism.   Further, Defendants embedded their own critical commentary within the logo, such that it read "Aviva Uncovered The Sad Truth About Aviva's Business Practices."  Doc. 188-1 at 144.  The Court notes that the purpose of the nominative fair use test is "to address the risk that nominative use of the mark will inspire a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010).  Indeed, the Ninth Circuit specifically identified the second factor as "indirectly" addressing the risk of such confusion: "Consumers may reasonably infer sponsorship or endorsement if a company uses . . . 'more' of a mark than necessary." *Id.*  In light of that purpose, the Court finds that the amount of Aviva's trademark and trade dress used by Defendants was reasonable.  In other words, Defendants' use of the more distinctive colors and font, in light of the very obvious negative commentary directed toward Aviva that is included in the logo, could not reasonably lead to such confusion.  Therefore, Defendants have satisfied all three factors of the nominative fair use test.  Accordingly, Defendants' use was a nominative fair use, and there existed no likelihood of confusion.

**IV.    AVIVA'S CYBERSQUATTING CLAIM**

The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), was enacted to address the problem of "cybersquatting."  The Ninth Circuit has generally described this practice as follows:

> Cybersquatting is the Internet version of a land grab.  Cybersquatters register well-known brand names as Internet domain names in order to force the rightful owners of the marks to pay for the right to engage in electronic commerce under their own name.

*Interstellar Starship Services, Ltd. v. Tchou*, 304 F.3d 936, 946 (9th Cir. 2002).  The ACPA states that

> [a] person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark . . . ; and (ii) registers, traffics in, or uses a domain name [that is confusingly similar to another's mark or dilutes another's famous mark].

15 U.S.C. § 1125 (d)(1)(A).  Defendants do not contest the second prong regarding the registration of confusingly similar domain names.  However, Defendants argue that Aviva's ACPA claim fails because Aviva cannot prove that Defendants had a bad faith intent to profit from the mark.

Indeed, "[a] finding of 'bad faith' is an essential prerequisite to finding an ACPA violation." *Tchou*, 304 F.3d at 946.  The ACPA lists nine non-exhaustive factors to consider when determining whether a defendant had a bad faith intent to profit from use of a mark:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;

> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(I).  As the Sixth Circuit has stated, "[t]hese factors attempt 'to balance the property interests of trademark owners with the legitimate interests of Internet users and others who seek to make lawful uses of other's marks, including for purposes such as comparative advertising, *comment*, *criticism*, parody, news reporting, fair use, etc.'" *Lamparello*, 420 F.3d at 319 (quoting H.R. Rep. No. 106-412, 1999 WL 970519, at *10) (emphasis provided by *Lamparello* court).

To begin, the Court notes that there is no evidence in this case of traditional cybersquatting.  That is, there is no evidence that Defendants have made any attempt to sell the registered domain names to Aviva for profit.  Accordingly, the sixth factor favors Defendants.

Furthermore, as discussed above, the Court has found that the undisputed evidence demonstrates that the Website was noncommercial and that its purpose was to criticize Aviva and to inform potential consumers about Mr. Vazirani's concerns about Aviva's business practices.  Importantly, the legislative history for the ACPA states the following:

Under the bill, the use of a domain name for purposes of comparative advertising, comment, criticism, parody, news reporting, etc., even where done for profit, would not alone satisfy the bad-faith intent requirement.  The fact that a person may use a mark in a site in such a lawful manner may be an appropriate indication that the person's registration or use of the domain name lacked the required element of bad-faith.

S. Rep. No. 106-140, 1999 WL 594571, at *14.  In accordance with this guidance, other courts have placed great weight on these considerations in finding a lack of bad-faith intent. *See, e.g.*, *TMI, Inc. v. Maxwell*, 368 F.3d 433, 438-40 (5th Cir. 2004) ("[T]he site's purpose as a method to inform potential customers about a negative experience with the company is key."); *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004) ("Perhaps most important to our conclusion are[] Grosse's actions, which seem to have been undertaken in the spirit of informing fellow consumers about the practices of a landscaping company that she believed had performed inferior work on her yard.").  Thus, because the Defendants used the domain names primarily for purposes of comment and criticism, and further did not do so for profit, the Court finds that the fourth factor strongly favors Defendants.

The fifth factor also favors Defendants.  "This factor recognizes that one of the main reasons cybersquatters use other people's trademarks is to divert Internet users to their own sites by creating confusion as to the source, sponsorship, affiliation, or endorsement of the site."  S. Rep. No. 106-140, 1999 WL 594571, at *14.  Thus, the factor requires the existence of a likelihood of confusion as to these considerations.  As discussed above, there is no evidence that a likelihood of confusion exists with regard to the source of the material on the Website.  No reasonable jury could find that the criticism on the Website came from a source other than Mr. Vazirani, and certainly not from Aviva itself.  Aviva's only evidence to the contrary consists of users who experienced actual, but temporary, confusion over the source of the Website prior to realizing that, because of the content of the Website, it did not originate from Aviva. *See, e.g.*, Doc. 179 at ¶ 25.  Such fleeting confusion is not sufficient to establish a likelihood of confusion.[8]

The first three factors, on the other hand, do not favor Defendants because there is no

---

[8] In any event, the Court also notes that much, if not all, of Aviva's evidence of any actual confusion consists of the inadmissible hearsay testimony of Paul McGillivray, as recounted in the declaration of Janet Sipes (Doc. 179). *See, e.g.*, *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1514 (9th Cir. 1991) (noting that hearsay evidence cannot be introduced to defeat a summary judgment motion).

evidence that Defendants had any rights in the domain names prior to registering the domain names and creating the Website.   However, though the domain names used by the Defendants may not be related to any trademarks owned by the Defendants, legal names of the Defendants, or goods or services previously sold by Defendants, the domain names chosen by Defendants do relate to the criticism of Aviva.  *See* Doc. 188-2 at 18-40; Doc. 188-5 at 108-145 (the domain names registered by Defendants included *insideaviva.com*, *aviva-exposed.com*, *avivauncovered.com*, *aviva-lawsuit.com*, *aviva-problems.com*, *aviva-litigation.com*, *avivacomplaints.com*, *avivaplcsucks.com*, *avivasucksusa.com* and others). The legislative history of the ACPA recognizes such criticism as a valid objective that the ACPA was not intended to punish.  Therefore, these factors only minimally favor Aviva.

Similarly, the seventh factor also does not favor Defendants.  This factor primarily recognizes that "[f]alsification of contact information with the intent to evade identification and service of process by trademark owners is . . . a common thread in cases of cybersquatting."  S. Rep. No. 106-140, 1999 WL 594571, at *15.  Here, while there is evidence that Defendants provided false contact information with the registration of at least some of the domain names, *see, e.g.*, Doc. 188-2 at 21, there is no evidence that they did so with the intent to evade identification or service of process by Aviva.  Indeed, Mr. Vazirani clearly identifies himself on the Website and takes credit for its content.  Thus, while this factor certainly doesn't favor Defendants, it only minimally favors Aviva, if at all.

The eighth factor also does not favor Defendants.  As is stated in the legislative history of the ACPA,

> [t]his factor recognizes the increasingly common cybersquatting practice known as "warehousing," in which a cybersquatter registers multiple domain names—sometimes hundred, even thousands—that mirror the trademarks of others.  By sitting on these marks and not making the first move to offer to sell them to the mark owner, these cybersquatters have been largely successful in evading the case law developed under the Federal Trademark Dilution Act. *This bill does not suggest that the mere registration of multiple domain names is an indication of bad faith*, but allows a court to weigh the fact that a person has registered multiple domain names that infringe or dilute the trademarks of others as part of its consideration of whether the requisite bad-faith intent exists.

S. Rep. No. 106-140, 1999 WL 594571, at *15-16 (emphasis added).  While it is undisputed

that Defendants registered multiple domain names to host the Website, there is no evidence of any desire to sell the domain names to Aviva, and thus no evidence that the Defendants were "sitting on [the] marks" in anticipation of any sale.  Further, there is no credible evidence of any "warehousing" of domain names in this case because Defendants registered a total of only fourteen domain names, all of which were related to Defendants' hosting of the Website.  Thus, though this factor does not favor Defendants, like the seventh factor, it only minimally favors Aviva, if at all.

Finally, Aviva acknowledges that the ninth factor is inapplicable in this case because "Aviva makes no dilution claim." Doc. 177 at 22.  This factor is therefore neutral.

After analyzing the relevant factors, the Court finds that Aviva has failed to establish that Defendants acted with the required bad-faith intent to profit when they registered the domain names.  Importantly, because the Website was not commercial, it was used only to criticize Aviva, and the Defendants never made any attempt to sell the domain names for profit, Defendants' actions do not fall within the scope of the ACPA.  In other words, Defendants' "conduct is not the kind of harm that [the] ACPA was designed to prevent." *TMI*, 368 F.3d at 440.  Therefore, the Court will grant Defendants' motion for summary judgment on Aviva's ACPA claim and deny Aviva's motion for summary judgment on that claim.

## V.   AVIVA'S COMMON LAW UNFAIR COMPETITION CLAIM

Aviva has asserted a common law unfair competition claim against Defendants based on the same conduct on which Aviva asserts its Lanham Act claims, i.e., trademark infringement.  The Arizona Supreme Court has stated that "the essence of unfair competition is confusion of the public.  If such confusion exists, the relevant inquiry is whether the name taken by a defendant has previously come to indicate the plaintiff's business." *Taylor v. Quebedeaux*, 126 Ariz. 515, 516, 617 P.2d 23, 24 (1980) (citations omitted).

Here, as described above, there is no likelihood of confusion of the public arising from Defendants' use of Aviva's marks.  Defendants' use of any trademarks or trade dress owned by Aviva was a nominative fair use that was not in connection with any goods or services.

The use was noncommercial and directed solely at criticizing Aviva. Therefore, because Aviva has failed to provide any evidence of a likelihood of confusion, the Court will grant summary judgment in favor of Defendants on Aviva's common law unfair competition claim and deny Aviva's motion for summary judgment on that claim.

## VI. AVIVA'S RACKETEERING CLAIM

Defendants have also moved for summary judgment on Aviva's state-law racketeering claim brought under Arizona's anti-racketeering statute ("AZRAC"). The Court previously granted Defendants' motion for judgment on the pleadings with regard to Aviva's federal racketeering claim. Doc. 169. The Court's decision to grant that motion was based primarily on Aviva's failure to allege a "pattern of racketeering activity" as that phrase is defined under the federal anti-racketeering statute ("RICO"). *Id.*; *see also* 18 U.S.C. §§ 1961(5).

AZRAC also requires evidence of a "pattern of racketeering activity." A.R.S. §13-2314.04(T)(3). Specifically, the statute states the following:

> "Pattern of Racketeering Activity" means . . . :
>
> (a) At least two acts of racketeering as defined in § 13-2301, subsection D, paragraph 4, subdivision (b), item (iv), (v), (vi), (vii), (viii), (ix), (x), (xiii), (xv), (xvi), (xvii), (xviii), (xix), (xx), (xxiv), or (xxvi) that meet the following requirements:
>
> (i) The last act of racketeering activity that is alleged as the basis of the claim occurred within five years of a prior act of racketeering.
>
> (ii) The acts of racketeering that are alleged as the basis of the claim were related to each other or to a common external organizing principle, including the affairs of an enterprise. Acts of racketeering are related if they have the same or similar purposes, results, participants, victims, or methods of commission or are otherwise interrelated by distinguishing characteristics.
>
> (iii) The acts of racketeering that are alleged as the basis of the claim were continuous or exhibited the threat of being continuous.

*Id.* AZRAC also contemplates a pattern of racketeering activity arising from "a single act of racketeering," but only in limited circumstances that do not apply in this case. *See* A.R.S. § 13-2314.04(T)(3)(b). Furthermore, extortion, forgery, and fraud, all when committed for financial gain, are among the predicate acts that might constitute a pattern when at least two acts are committed. A.R.S. § 13-2301(D)(4)(iv), (ix), (xx).

1    The Arizona Court of Appeals concluded in *Lifeflite Med. Air Transport, Inc. v.*

2  *Native Am. Air Servs., Inc.* that the Arizona legislature intended that AZRAC's definition of

3  "pattern of racketeering activity" should be interpreted in accordance with the U.S. Supreme

4  Court's interpretation of that phrase in the federal statute. 7 P.3d 158, 151-53 (Ariz. Ct. App.

5  2000).  With regard to the federal statute, the Supreme Court has stated that it was Congress'

6  intent that a plaintiff, in order to demonstrate a pattern of racketeering activity, "must show

7  that the racketeering predicates are related, *and* that they amount to or pose a threat of

8  continued criminal activity."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229,

9  239 (1989) (emphasis in original).  In that case, the Supreme Court went on to further

10  elaborate on "these two constituents of RICO's pattern requirement"—relatedness and

11  continuity.  *Id.* at 239-49.

12    The *Lifeflite* court considered the propriety of a lower court's use of a jury instruction

13  regarding a plaintiff's burden to establish a pattern of racketeering activity under Arizona

14  law. *Lifeflite*, 7 P.3d at 151.  The instruction paraphrased the Supreme Court's interpretation

15  of continuity from *H.J. Inc.  Id.* (The instruction stated, in part, that "'[c]ontinued unlawful

16  activity' means a series of related acts extending over a substantial period of time or past

17  conduct that by its nature projects into the future with a threat of repetition.  Acts extending

18  over a few weeks or months and threatening no future criminal conduct are not 'continued

19  unlawful activity.'"); *see H.J. Inc.*, 492 U.S. at 241-42.  The court noted that AZRAC, as

20  amended by the Arizona legislature in 1993, "incorporates the Supreme Court's definition

21  of related acts but does not expressly include the Court's definition of continuing activity."

22  *Id.* at 152.  Nevertheless, the court further observed that "[t]he history of the amendments to

23  Arizona's racketeering statute suggests a legislative awareness of the Supreme Court's

24  definition of continuing activity and an intention to accept it implicitly, if not explicitly." *Id.*

25  at 153.  Thus, the court affirmed the lower court's use of the instruction: "Because an

26  interpretation of the Arizona statute to include the federal definition of continued unlawful

27  activity is both reasonable and consistent with the apparent legislative intention in amending

28  the statute, we find that the jury instruction was a proper statement of law." *Id.*

In Aviva's first amended complaint, Aviva alleged violations of both RICO and AZRAC. Doc. 42 at 24-26. Both the RICO and the AZRAC claims were based on identical alleged predicate acts of extortion, forgery, and wire fraud. *Id.* Defendants moved for judgment on the pleadings with regard to only the RICO claim, and the Court granted that motion. Doc. 169. In doing so, the Court held that the alleged acts of extortion, forgery, and wire fraud did not meet RICO's continuity requirement under the standard announced in *H.J. Inc.* Based on the Arizona Court of Appeals' holding in *Lifeflite*, under which this Court must also apply the *H.J. Inc.* continuity standard to Aviva's AZRAC claim, Aviva's allegations with respect to that claim are necessarily also insufficient because they involved identical alleged predicate acts.

The conclusion is no different at the summary judgment stage. Aviva's allegations that Defendants engaged in a pattern of racketeering activity are simply not supported by the evidence. In the Court's Order of May 10, 2012, the Court held that Aviva had properly alleged only one predicate act of extortion, and assumed that Aviva had sufficiently alleged acts of wire fraud and forgery. As the Court discussed in that Order, even if the Court assumes that Aviva can prove acts of extortion, forgery, and wire fraud, these acts together do not constitute a pattern under the *H.J. Inc.* framework:

> Even assuming here that the alleged acts of wire fraud and forgery constitute distinct predicate acts for purposes of RICO, those acts combined with the predicate act of extortion described above do not sufficiently establish a pattern of racketeering activity. Rather, this "collective conduct is in a sense a single episode having [a] singular purpose." [*Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir. 1992)]. That is, both the alleged wire fraud and forgery were simply steps taken to further the Defendant's single alleged extortion scheme, which it targeted only at Plaintiffs. Moreover, the fact that all of the alleged predicate acts here occurred within less than a year further undermines a finding of closed-ended continuity. *See, e.g.*, *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1418 ([3d] Cir. 1991) ("[A]n eight-month period of fraudulent activity directed at a single entity does not constitute a pattern, absent a threat of future criminal acts.").

> With regard to a threat of future criminal conduct, the acts alleged in the amended complaint are clearly all "designed to bring about a single event"–the "paying off" of Defendants. *See Sever*, 978 F.2d at 1535-36. There is no suggestion of other potential victims or that Defendants will continue to commit acts of extortion, wire fraud, or forgery against Plaintiffs once the alleged objective is completed. In other words, there is no indication that the alleged "racketeering acts themselves include a specific threat of repetition

1

extending indefinitely into the future," which would "supply the requisite threat of continuity." *See H.J. Inc.*, 492 U.S. at 242.

2

3

Further, as the amended complaint itself demonstrates, Defendants' alleged acts of wire fraud and forgery, which related to the Tranche 1 and Tranche 2 Domain Names, were not allegedly repeated with the Tranche 3 and Tranche 4 Domain Names, further indicating that these acts have not "become a regular way of conducting business" for the Defendants. *See* [*Ticor Title Ins. Co. v. Florida*, 937 F.2d, 447, 450 (9th Cir. 1991)]. Thus, the alleged acts "[do] not pose a threat of continuity," *see Sever*, 978 F.2d at 1536, and Plaintiffs have failed to allege a pattern of racketeering activity under RICO.

4

5

6

7

Doc. 169 at 8-9 (footnotes omitted). Aviva has not pointed to any evidence in its summary

8

judgment briefing that would alter the Court's conclusion that Aviva has not met the

9

continuity requirement that applies under both RICO and AZRAC. Accordingly, the Court

10

will grant Defendants' motion for summary judgment on Aviva's AZRAC claim.

11

## VII.   AVIVA'S CLAIMS FOR DAMAGES

12

Because the Court has granted summary judgment in favor of Defendants on all of

13

Aviva's remaining claims, the Court need not reach the issue of whether Aviva has met its

14

burden with respect to damages. Therefore, the Regan Defendants' motion for summary

15

judgment is denied as moot.

16

## VIII.   THE COUNTERCLAIMS

17

Counterclaimants assert claims of: (1) Non-Infringement of § 32 of the Lanham Act,

18

15 U.S.C. § 1114 (Counterclaim No. 1) Doc. 50 at 10, ¶¶ 8-12; (2) Non-Infringement of

19

Alleged Trade Dress Rights and Unfair Competition (Counterclaim No. 2) *Id.* at 11, ¶¶ 13-

20

17; and (3) Lack of Federal Cyberpiracy, Violations of § 43(d) of the Lanham Act and the

21

Anti-Cyber Squatting Protection Act, 15 U.S.C. § 1125(d) (Counterclaim No. 3) *Id.* at 11-12,

22

¶¶ 18-22.

23

As relief, Counterclaimants request the following judicial declarations: (1) that

24

counterclaimants have not infringed counterdefendants' trademark rights or violated § 32 of

25

the Lanham Act, 15 U.S.C. § 1114; (2) that counterdefendants alleged trade dress rights are

26

not protectable; (3) that counterclaimants have not infringed counterdefendants' trademark

27

rights in connection with counterdefendants' alleged trade dress rights and have not violated

28

§ 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a); and (4) that counterclaimants have not

infringed upon counterdefendants' trademark rights, have not violated § 43(b) of the Lanham Act. and have not violated the Anti-Cyber Squatting Protection Act, 15 U.S.C. § 1125(d). (*Id.* at 12, ¶¶ C-F).

As discussed more fully in section III(A) above, Aviva is entitled to summary judgment on the part of Counterclaim No. 2 that seeks a declaration that counterdefendants' alleged trade dress rights are not protectable. With regard to the remainder of the requested declaratory relief, the Counterclaimants have failed to establish that they are entitled to the declarations requested because such declarations are based on allegations that are entirely duplicative of Aviva's claims against Counterclaimants.

Aviva previously requested that all of the Counterclaims be dismissed because such Counterclaims were redundant of Counterclaimants' denials and affirmative defenses. The Court denied Aviva's request to dismiss the Counterclaims without prejudice. Doc. 101. The Court found that a challenge to the Counterclaims was premature because Aviva failed to show that there was no doubt that the Counterclaims would be rendered moot by the adjudication of the main action. *Id.* The Court has now determined that, with the exception of the part of Counterclaim No. 2, on which Aviva is entitled to summary judgment, the remainder of the Counterclaims are duplicative of the claims alleged in Plaintiffs' Amended Complaint.

Counterclaimants have failed to show that they are entitled to declaratory relief in addition to receiving summary judgment in their favor on the claims in Plaintiffs' Complaint. The "Declaratory Judgment Act provides courts with discretion to either grant or dismiss a counterclaim for declaratory judgment." Doc. 101 (internal citation and quotation omitted). Counterclaimants have failed to show the necessity of declaratory judgment on their Counterclaims. Accordingly, the Court will not enter declaratory judgments on the Counterclaims. Moreover, because declaratory judgment is the only relief sought on the Counterclaims, the Counterclaims (Counterclaim No. 1, the remaining part of Counterclaim No. 2, and Counterclaim No. 3) will be dismissed.

## IX.    AVIVA'S MOTION TO SEAL

Aviva has filed a motion to seal a four-page exhibit attached to the declaration of Chris Jones, which Aviva has filed in support of its motion for summary judgment. A party seeking to seal a document attached to a dispositive motion must overcome a "strong presumption in favor of access" and meet a "compelling reasons" standard. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). That is, "the party must articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Id.* (citations and punctuation omitted). It is then a court's duty to balance the competing interests of the public and the party seeking to seal the record. *Id.* at 1179. If a court decides to grant the motion to seal, it must "base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995)).

Compelling reasons to seal a judicial record typically will exist when such court files might become "a vehicle for improper purposes, such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)). However, "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* (citation omitted).

Aviva states that the exhibit it seeks to seal "contains specific information relating to Aviva USA Corporation's ("AUSA's") marketing and advertising budget and actual expenditures, including detailed breakdowns of AUSA's marketing and advertising efforts." Doc. 186 at 2. Aviva further argues that this information is "protectable trade secret information" that Aviva does not make publicly available and that could jeopardize Aviva's competitive standing if Aviva's competitors were to acquire it. *Id.* at 2-3.

The Court's review of the exhibit indicates that it does indeed contain information related to budgeted and actual expenditures in various marketing-related categories over a

time range spanning several years.  Furthermore, the information does not appear to be a type that a business would typically make public or choose to reveal to competitors.

On the other hand, it is not immediately apparent how a competitor might use the information in the exhibit to competitively injure Aviva.  In its motion, Aviva only generally states that competitive injury will arise from a competitor's decision, based upon seeing the information in this exhibit, to simply spend more on a particular category than Aviva spends, thereby putting Aviva at a competitive disadvantage.  Though the Court acknowledges that there is some plausibility to this theory, it nevertheless does involve some conjecture.  Thus, while Aviva has to some degree provided a factual basis for the Court to seal this exhibit, it has left some doubt as to how compelling these reasons are.

However, because the Court finds that the public interest in this exhibit will not interfere with the public's interest in understanding the judicial process, the Court will grant Aviva's motion.  Of particular importance is that, though this exhibit was attached to a dispositive motion for summary judgment, the Court's analysis and resolution of the parties' motions for summary judgment did not address the information in this exhibit.  Thus, permitting this exhibit to be sealed will not interfere with the "public interest in understanding the judicial process." *Kamakana*, 447 F.3d at 1179 (citations omitted). Further, the material that Aviva seeks to seal represents a very small portion of the total amount of evidence submitted to this Court in connection with the summary judgment motions—only four out of several hundred pages.  Finally, while perhaps not a very strong factor, the Court notes that Aviva's motion is unopposed by Defendants.

Accordingly, the Court finds that Aviva has stated reasons that are sufficiently compelling, if only barely, to grant its motion to seal.  Thus, the Court will permit the four-page Exhibit F to the declaration of Chris Jones to be sealed.

## X.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Aviva's Motion for Summary Judgment (Doc. 177) is denied in part and granted in part as follows:

Aviva's Motion for Summary Judgment is granted solely to the extent it requests summary judgment on the part of Counterclaimants' Counterclaim No. 2 that alleges that Aviva's Trade Dress "is not inherently distinctive and has not acquired secondary meaning." Aviva's Motion for Summary Judgment is denied in all other respects.

**IT IS FURTHER ORDERED** dismissing Counterclaimants' Counterclaims, except for the part of Counterclaim No. 2 on which Aviva is granted summary judgment, as set forth herein. Counterclaimants to take nothing on their Counterclaims.

**IT IS FURTHER ORDERED** granting the Vazirani Defendants' Motions for Summary Judgment (Docs. 174 and 175) and the Regan Defendants' Joinder in the Vazirani Defendants' Motions for Summary Judgment (Doc. 191). The Clerk of the Court shall therefore enter judgment for all Defendants on the claims in Plaintiffs' Complaint.

**IT IS FURTHER ORDERED** denying as moot the Regan Defendants' Motion for Summary Judgment (Doc. 172).

**IT IS FURTHER ORDERED** denying as moot the Vazirani Defendants' Motion to Strike Portions of Aviva's Reply in Support of its Motion for Summary Judgment (Doc. 228).

**IT IS FURTHER ORDERED** granting Aviva's Motion to Seal Document Offered in Support of Motion for Summary Judgment (Doc. 186). The Clerk of the Court shall file under seal the exhibit lodged at Doc. 187.

DATED this 2nd day of October, 2012.

James A. Teilborg
United States District Judge